Cornelius J. Ryan v. Commissioner. Marie U. Kearney v. Commissioner.
Ryan v. Commissioner
Docket Nos. 18642, 18643.
United States Tax Court
1949 Tax Ct. Memo LEXIS 87; 8 T.C.M. (CCH) 804; T.C.M. (RIA) 49218; August 31, 1949
Loren C. Berry, Esq., for the petitioners. Albert J. O'Connor, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined a deficiency in the income tax of Cornelius J. Ryan (Docket No. 18642) for the taxable year 1943 in the amount of $2,622.53. The Commissioner determined a deficiency in income tax of Marie U. Kearney (Docket No. 18643) for the taxable year 1943 of $4,948.14. Cornelius J. Ryan claims an overpayment of income tax of $18.41 and Marie U. Kearney claims an overpayment of $1.38. The question before us is whether certain sums received February 7, 1944, by petitioners, who were then beneficiaries of a trust, by reason of the trustees' breach of fiduciary duties, which breach resulted *88 in a loss of trust income, constituted trust income of said beneficiaries for the year 1943, or whether said amounts so received were in settlement of a claim for damages and constituted taxable income in 1944. These proceedings were consolidated for opinion. Findings of Fact Petitioners are individuals residing at Dalton, Pa. Their respective returns for 1943 were filed with the collector of internal revenue for the 12th district of Pennsylvania. Their returns were filed and income reported on a cash basis. Petitioners' father, Cornelius J. Ryan, died in 1911, a resident of New York County, N. Y. His will was admitted to probate by the Surrogate's Court of the County of New York. His will directed that his estate be divided into six equal trusts, one for the benefit of each of his six children, including the petitioners herein. Petitioners were entitled to receive the income from their respective trusts until they reached the age of 35, whereupon the trusts were to terminate and the beneficiaries were to receive the principal. Petitioner Kearney reached 35 years of age on May 22, 1938, and petitioner Ryan on October 18, 1941. Shortly after C. J. Ryan's death Title Guarantee *89 and Trust Company was appointed trustee of said trusts along with the testator's widow. Upon her death in 1912 one William F. Brown and one Michael G. Ryan were appointed and qualified as successor trustees. Following Michael G. Ryan's death William F. Brown has continued to act as surviving trustee, together with the corporate trustee. In March 1938 the trustees commenced a proceeding for the settlement of their accounts for the period April 20, 1927, to November 9, 1937. The six beneficiaries, including the petitioners herein, filed numerous objections to the accounts and by petitions sought surcharges against the trustees, requiring them to replace in cash the principal of trust investments improperly disposed of by the trustees and to reimburse petitioners for income which the trusts had either dissipated or failed to realize. The petitions alleged that trustee Brown and deceased trustee Michael G. Ryan had either deliberately or through negligence assisted in the alleged breaches of trust by the corporate trustees. Title Guarantee and Trust Company and W. F. Brown as surviving trustees, and W. F. Brown as ancillary executor of the last will and testament of Michael G. Ryan, *90 deceased, as trustees, filed an answer to the petition. The Surrogate, by decree entered February 14, 1941, upheld the bulk of the objections to the conduct of the trusts by the corporate trustee, but overruled all objections to the conduct of the trusts by the living and deceased personal trustees. The decree of the Surrogate provided that Title Guarantee and Trust Company should "replace in cash the principal amount of the investments referred to" in those objections which the Court had sustained "together with the amounts advanced from the trust funds for the salvage of such investments as are in default." The corporate trustee was also "surcharged with interest at the rate of four per cent per annum from and after the date when each such investment failed to yield income at the rate of four per cent per annum less such income as was received by the trustees on such investments after the date they failed to yield at least for four per cent interest." This interest rate was increased to six per cent in certain cases where Title Guarantee and Trust Company was guilty of willful misconduct. The decree further provided that said corporate trustee "is entitled to commissions as *91 trustee for receiving and paying out the income surcharged against it as herein decreed, one-half of such commissions to be paid to it upon payment of such surcharges and one-half thereof to be paid on paying out such income * * * and that William F. Brown, cotrustee, is hereby denied commissions for receiving and paying the said income surcharges hereinabove directed." The decree further provided: "That Title Guarantee and Trust Company pay each of the respondents the amount of income hereinabove found to be on hand as of November 9, 1937, less commissions for receiving and paying the income surcharges hereinabove set forth as follows: Ellen Ryan Lynch
$5,039.60
Marie U. Kearney
8,116.40
Alice Ryan Barry
6,111.34
Cornelius Ryan
3,777.19
Ralph S. Daniels as ancillary commit-
tee for Timothy Burke Ryan
7,325.20
Ann Ryan Hulswit
7,197.59 and that each of them have execution therefor." The amounts in said decree "found to be on hand as of November 9, 1937," were as follows: Ellen Ryan Lynch
$5,173.02
Marie U. Kearney
8,331.78
Alice Ryan Barry
6,280.08
Cornelius J. Ryan
3,885.25
Ralph S. Daniels as ancillary commit-
tee for Timothy Burke Ryan
7,508.56
Ann Ryan Hulswit
7,380.65
*92 In each case the last amounts above included the debit or credit balances due the beneficiaries of the trusts on November 9, 1937, plus the surcharges and accumulated interest to said date, minus expenses of the trusts. From the resulting amount the trustees commissions were deducted so as to arrive at the final amount found due as above set forth. An appeal was taken from the Surrogate's decree to the Appellate Division of the Supreme Court and during said appeal the Surrogate issued an order staying enforcement of said decree. The Appellate Division affirmed the Surrogate, whereupon an appeal was taken to the Court of Appeals and the Surrogate issued an order staying the enforcement of the decree during this appeal. On December 2, 1943, the Court of Appeals handed down a decision affirming the decision of the Surrogate and the order of affirmance of the Appellate Division and a remittitur was issued. During the pendency of this appeal petitioners herein became 35 years of age and entitled to a final accounting but made no request therefor because of the unsettled questions involved in the appeal. On December 10, 1943, the Surrogate held a conference with counsel of all *93 parties, whereat the attorneys for the trustees announced their intention to apply for allowance of attorneys fees for their services to the corporate trustee in the recent appeals and the Surrogate said that he would not enter a judgment on remittitur until this question and all other disputes had been resolved. The remittitur was filed with the Surrogate on December 16, 1943. Counsel for petitioners thereupon prepared and presented to opposing counsel a proposed decree on remittitur which was set for settlement on December 28, 1943, but at that time the Surrogate would not approve the decree as prepared and continued the matter of settlement to January 10, 1944. Following the remitittur there were four matters in dispute between the beneficiaries and the trustees: (1) the computation of the costs of the appeal to the Court of Appeals; (2) the trustees' application for an allowance for attorneys fees for services rendered to it on the appeal; (3) the rate of interest to be charged on the surcharged amounts for the period after November 9, 1937; and (4) the closing date to terminate the running of interest. The Surrogate suggested that the trust be closed out and the account for *94 the period subsequent to November 9, 1937, be handled by a voluntary release instead of by a judicial settlement of accounts. It was therefore agreed by the trustees and the beneficiaries on December 17, 1943, that the interest on surcharges after November 9, 1937, would be 3 1/2 per cent. Shortly thereafter and before February 7, 1944, the parties agreed between themselves as to the amount of appeal costs which might be taxed and that the corporate trustee might use December 29, 1943, as a cut-off date for the running of interest. The Surrogate's final order on remittitur was entered on January 31, 1944. On February 7, 1944, the corporate trustee distributed the trust funds of the Kearney and Cornelius J. Ryan trusts to the respective beneficiary remaindermen. The sums distributed included the income surcharges and the principal surcharges with interest for the period ending November 9, 1937, plus the additional surcharges decided upon by the parties with interest for the period ending December 29, 1943. During the pendency of the litigation the parties had reached an oral agreement that the trustees should pay the petitioners, pending final termination of the litigation, the net *95 income realized by the trusts unaffected by the Surrogate's decree of February 14, 1941, and that petitioners might accept the same without prejudice to their claim that the investments which yielded the income were improper and that the income iself was insufficient in amount. Petitioners in their respective income tax returns for 1943 reported as income the amounts distributed by the corporate trustee, i.e, Marie U. Kearney
$2,772.42
Cornelius J. Ryan
3,326.00
In his determination of deficiency the Commissioner added to the reported income of Cornelius J. Ryan for the year 1943 $6,301.12 and to the reported income of Marie U. Kearney he added $13,658.69. The reason given for this addition was "additional taxable income from the estate of Cornelius J. Ryan, deceased, as disclosed by examination of the books and records of the Title Guarantee and Trust Company, trustee." During 1943 the income, expenses and distributable balances of petitioners' two trusts, as unaffected by the decree of the Surrogate of February 14, 1941, were as follows: Cornelius J.
Marie U.
Ryan
Kearney
Income
$2,999.28
$3,415.11
Expenses
146.41
130.47
Distributable income
2,852.67
3,284.64
*96 The uninvested cash of those trust funds was commingled with other cash in the possession of Title Guarantee and Trust Company whose established policy it was to keep all cash on hand at the same place. A separate deposit account was set up for each trust and was carried on the bank's books as were the other deposit accounts. On December 28, 1943, Title Guarantee and Trust Company made out transfer slips or credit vouchers which credited the trusts' deposit accounts with the amounts of income surcharges and charged this amount to the corporate trustees proprietary account. A credit entry was made in the trust deposit account on December 29, 1943, for the amounts of income surcharges and debit entries to the same accounts were made on February 7, 1944, at the time of distribution. The principal surcharges were handled in the same way as the income surcharges. At all times involved herein Title Guarantee and Trust Company was solvent. On December 31, 1943 the corporate trustee notified the beneficiaries that the amounts of surcharges had been credited to their accounts. The corporate trustee, however, would not pay the amount of the surcharges to the beneficiaries until an accounting *97 was accepted by the beneficiaries and a receipt and release was obtained from them. The corporate trustee filed fiduciary returns for the year 1943 on Form 1041 in which it reported the amount of income surcharges as being income received by the trusts in the year 1943 and in which it deducted the amount of income surcharges as being income distributable to the beneficiaries. Title Guarantee and Trust Company kept its own accounts on an accrual basis but the trust accounts were kept and the fiduciary tax returns were prepared on a cash basis. Petitioners did not report the income surcharges as a part of their gross income in their 1943 individual income tax returns but did so in their 1944 returns. Opinion Petitioners have not questioned in this proceeding the computation of the Commissioner as to the amount of surcharge income received in 1944. They concede that they incorrectly reported in their 1943 returns only the amounts which the trustee paid to them in that year, and state they should have reported as trust income in 1943 all of the distributable income of the trust which was realized in that year regardless of whether or not it was actually paid to them in that year. *98 Petitioners contend, however, that the income on which the asserted deficiencies are based, viz., the amounts received from Title Guarantee and Trust Company on February 7, 1944, in excess of the corpus of their respective trusts, did not constitute trust income but represented damages payable to them by the trustee in its individual capacity because of the maladministration of the trust. According to petitioner these amounts constituted taxable income in 1944, the year in which they were actually received. Respondent contends that the amounts received by petitioners on February 7, 1944, as above described, constituted income to the trusts which was either distributable by the trustee in 1943, or income of the trusts for 1943 which became payable by the trustee within the first 65 days of 1944 and therefore taxable to the beneficiaries as 1943 income under the provisions of sections 162 (b) and 162 (d) (3) (A). [1]
*99 We agree with petitioner that ordinarily the year in which income is received or placed under the control of the taxpayer is the year in which it is taxable to him. Richards' Estate v. Commissioner, 150 Fed. (2d) 837. William J. Kyle, 15 B.T.A. 1247, aff'd. 43 Fed. (2d) 291, cert. denied 282 U.S. 896. However, we disagree with petitioners' contention that the above described trust payments received by the beneficiaries on February 7, 1944, constituted income in 1944. Both parties agree that the tax status of the payments received as a result of the decree of the Surrogate's Court entered February 14, 1941, is identical with that of those payments received by virtue of the final agreement of the parties. It will clarify our reasoning in this case to keep in mind that Title Guarantee and Trust Company has functioned in the various Ryan trusts in divergent capacities. It was both a trustee of the trust corpus and a bank depository of the trust's cash funds. As a bank, it also entered into transactions with itself as a corporate trustee to despoil the trust estate. The litigation which forms the basis of the tax question at bar *100 was started as the result of an account of trust principal and income filed by Title Guarantee and Trust Company as corporate trustee and William F. Brown as personal trustee. Objections were filed by the beneficiaries of the six trusts who also filed petitions asking, not for any specific judgment against said trustees, but praying for a decree directing the restitution of the trust corpus to its original value prior to the reduction of said value by certain acts of maladministration by the trustees. The petitioners prayed also that said trustees be surcharged for dissipation of income and for failure to collect the income which the corpus of the trust would have produced if the trustees had not committed their alleged improper acts. The Surrogate sustained the bulk of petitioners' objections and granted the relief prayed for against the corporate trustee. He found, however, that the personal trustee was in no way at fault and released him from all liability. At no time in this accounting procedure was Title Guarantee and Trust Company before the Court in any other capacity than as corporate trustee. The Surrogate, in rendering his decree, setting up the amount of surcharge payments *101 to be made by the corporate trustee, used as a basis for his accounting the trustees' record of income payments for the period up to November 9, 1937. The Surrogate then computed all of the income surcharges prior to November 9th which he found to be due, added these surcharges to the credit or debit balances of the various beneficiaries shown on the books on November 9, 1937, and then deducted the commissions due the corporate trustee for "receiving and paying" the surcharged income. The corporate trustee complied with the decree. Title Guarantee and Trust Company as a bank made the necessary book entries to show transfers of funds from the bank's general funds to the trust accounts and the trustee thereupon distributed those funds to the beneficiaries. The trustee deducted its commission for receiving the surcharge income from the bank and it deducted its commission for paying said surcharge income to the beneficiaries. There might be a modicum of merit in petitioners' position that the amounts which the Surrogate ordered that "Title Guarantee and Trust Company pay each of the respondents" were paid in settlement of claims for damages to petitioners personally if the amounts so *102 paid corresponded to the amount of the surcharge in each case and if there were no provision in said order for the corporate trustee to pay itself a commission "as trustee" for receiving and paying out these funds. As it is, however, the amount which the corporate trustee was ordered to pay in each case involved many factors besides the surcharge income and the computation of the amount to be paid thus constituted a final balance due to each beneficiary of all net trust income on November 9, 1937. Most obviously the Surrogate had no intention of doing other in his decree than to require the corporate trustee to account for the trust corpus with principal surcharges and trust income with income surcharges. It would be little less than ludicrous for a Court to order a tort feasor to pay damages and then permit him to deduct a commission for collecting the damages from his own pocket and paying it over to the injured person. Petitioner further argues that because the proceedings were initiated in the Surrogate's Court against Title Guarantee and Trust Company and William F. Brown as trustees and the final order directing payment to the beneficiaries was directed only to Title Guarantee *103 and Trust Company and required it alone to make the payments, the Surrogate had given a judgment against Title Guarantee and Trust Company in its corporate capacity alone and not as a trustee. The obvious answer to this argument is that after the Surrogate had found that the personal trustee was not negligent in his trust activity and did not participate in any way in the maladministration of the trust, the Surrogate could not, within the law, have made any decree obliging the personal trustee to participate in said payments to the trust beneficiaries in any way. Purdy v. Lynch, 145 N. Y. 462, 40 N.E. 232; Westfield v. Rogers, 174 N. Y. 230, 66 N.E. 813; In re Dawes Estate, 12 N.Y.S. (2d) 6; In re Whitmores Estate, 15 N.Y.S. (2d) 379. Petitioners' argument, therefore, based upon the elimination of the personal trustee from any obligation under the decree is also not well founded. The amounts received by petitioners on February 7, 1944, from Title Guarantee and Trust Company as trustee of the Cornelius J. Ryan Trust in excess of the trust corpus with principal surcharges was trust income distributable in 1943. Prior to December 31, 1943, the *104 amount of all income surcharges with interest thereon had been computed by the corporate trustee. Appropriate book entries had been made showing credits by Title Guarantee and Trust Company to each trust account and the corporate trustee notified the beneficiaries in writing of such action. The corporate trustee filed fiduciary income tax returns for 1943 showing receipt of said surcharge income and claiming deductions therefor as distributable trust income. Petitioners contend that the book entries of the corporate trustee had no tangible effect on the trust corpus or income and that the petitioners' rights should not be affected thereby. Since Title Guarantee and Trust Company as a bank kept all of its trust cash in a common fund, it would be difficult to devise any other method by which that corporation in its banking and in its trustee capacity could effectively carry out the Court's decree. The book entries reflected the corporate trustee's recognition of petitioners' right to the surcharge income and its availability for distribution to them. On December 31, 1943, the only issues between the corporate trustee and petitioners pertained to allowance of court costs and attorneys *105 fees and the fixing of a termination date for the running of interest. The continuance of the dispute over these minor items into the taxable year 1944 would doubtless permit the deduction of these expense items when actually paid but such payment could not affect the distributable character of the trust income during the year of its receipt by the trust. It is our conclusion that the surcharge income received by petitioners in 1944 was trust income distributable to petitioners in 1943 and taxable to petitioners in that year as provided in section 162 (b), I.R.C.Theodore R. Plunkett, 41 B.T.A. 700; aff'd. 118 Fed. (2d) 644; Charles S. Davis, 35 B.T.A. 1001. However, if it should be contended that the dispute over the question of the termination of the interest period, the payment of attorneys fees, and court costs would prevent the trust income from being "distributable" in 1943, petitioners' position would not be improved. The final order of the Surrogate's Court on remittitur was placed of record on January 31, 1944, and immediately thereafter the surcharge income became "payable" to the beneficiaries. Babette B. Israel, 11 T.C. 1064. *106 The trust income would therefore be taxable to petitioners in 1943, regardless of the disputes existing under the provisions of section 162 (d) (3) (A), supra, between the trustee and the beneficiaries on December 31, 1943. Our foregoing conclusions supporting the respondent's determination of deficiency effectively obviates the necessity of discussing petitioners' claims for overpayment. However, in view of the fact that the respondent's determination of deficiencies apparently involved the acceptance for computation of petitioners' reported receipt of trust income in their respective 1943 returns, which reports were erroneous according to our findings, some additional computation may be necessary to determine the exact deficiencies herein and accordingly Decisions will be entered under Rule 50. Footnotes
1. SEC. 162. NET INCOME. The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that - * * *
(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries, but the amount so allowed as a deduction shall be included in computing the net income of the legatees, heirs, or beneficiaries whether distributed to them or not. As used in this subsection, "income which is to be distributed currently" includes income for the taxable year of the estate or trust which, within the taxable year, becomes payable to the legatee, heir, or beneficiary. * * * * * *
(d) Rules for Application of Subsections (b) and (c). - For the purposes of subsections (b) and (c). - * * *
(3) Distributions in First 65 Days of Taxable Year. - (A) General Rule. - If within the first 65 days of any taxable year of the estate or trust, income of the estate or trust, for a period beginning before the beginning of the taxable year, becomes payable, such income to the extent of the income of the estate or trust for the part of such period not falling within the taxable year or, if such part is longer than 12 months, the last 12 months thereof, shall be considered, paid, credited, or to be distributed on the last day of the preceding taxable year.↩